STATE OF MAINE
KENNEBEC, ss

SUPERIOR COURT
Civil Action
Docket No. AP-11-058
*NM- KEN - 11/13/2012*

THANKS BUT NO TANK,
et al.,

Petitioners

v.

DECISION AND ORDER

MAINE DEPARTMENT OF
ENVIRONMENTAL
PROTECTION,

Respondents

Before the court is the petitioners' Rule 80C appeal of the Maine Department of Environmental Protection's (DEP) decision. The DEP granted Natural Resources Protection Act (NRPA) and Site Location of Development Act (Site Law) permits to DCP Midstream Partners (DCP). 38 M.R.S. § 480-A (2011); 38 M.R.S. § 481 (2011). The permits allow DCP to construct a liquefied propane gas terminal in Searsport, Maine.

BACKGROUND

In October 2011, the DEP issued a permit pursuant to NRPA and Site Law to DCP. (R. 99.) DCP proposed "the construction and operation of a liquid propane gas (LPG) terminal in Searsport, Maine," adjacent to the Mack Point Terminal.[1] (R. 99.) The DEP Order provides a detailed description of the plan. (R. 99.) The plan is also detailed in the permit applications (R. 6, 8) and the petitioners' statement of the facts. (Br. of Pets.' 7-9.) The most critical aspects of the project, as related to this appeal, are discussed below.

---

[1] "The Mack Point Terminal has an existing Liquid Cargo Pier, an existing Dry Cargo Pier, numerous existing truck load out facilities for products other than LPG, and is serviced by a Montreal, Maine and Atlantic Railroad spur." (R. 99 (from DEP Order).)

1

The project will include building a new bulk storage tank that "will be a vertical, insulated domed tank with diameter of approximately 202 feet and height above ground of approximately 138 feet." (R. 6 at 1-4.) The facility, which will operate continuously, will also utilize the Dry Cargo Pier for ship unloading, a truck loading station, and a rail car loading station. (R. 6 at 1-1.) Additionally, "the proposed terminal will include an emergency flare, expected to be approximately 75 feet tall, with a continuously operating propane pilot light." (R. 6 at 1-5.)

The surrounding area includes residential and commercial development, including a hotel and restaurant. (R. 6 at 1-6, 10, 13.) Sears Island is just outside of the one-mile radius. (R. 8 at A. 14A.) A photo-simulated view was provided to demonstrate the visibility from Sears Island's shore. (R. 8 at 14-4 & A. 14A.) The Maine Historic Preservation Commission reviewed an Architectural Survey report to review potential impacts to historic structures in the area. (R. 8 at 14-3.) Three scenic resources, in addition to the NPHP-listed or NPHP-eligible properties, are also within the three-mile radius used for the Viewshed Analysis. (Id.) "They are: Long Cove and Penobscot Bay, which are part of the Atlantic Ocean, Mosman Park, a municipal park near downtown Searsport, and Moose Point State Park, located near the Searsport/Belfast town line." (Id.) In its application, DCP claimed that the visual impact from these locations would be minimal and the "quality of the view is not significantly diminished." (R. 8 at 14-3, 14-4.)

Ship, truck, and rail traffic to Mack Point Terminal will increase as a result of this project. The current conditions are as follows:

The existing ship traffic at the two piers totals approximately 136 vessels per year on average with a maximum to date of 166 vessels per year. The number of trucks currently entering and exiting the Mack Point Terminal is approximately 20,000 per year on average with up to approximately 30,000 trucks per year as a maximum. The existing rail traffic is typically

2

approximately 2,500 rail cars per year, averaging about 10 to 15 cars at a time.

(R. 6 at 1-6.) The expected typical loading schedule for this facility is 50-60 trucks per day and eight rail cars per day, with a maximum of 144 trucks per day. (R. 6 at 1-5.)

DCP submitted applications pursuant to NRPA (R. 8) and Site Laws (R. 6). The NRPA application included a Visual Impact Assessment (VIA) (R. 8 at 14), which the plaintiffs found inadequate. Additionally, the Site Law application included a noise analysis. (R. 6 at § 5.) This analysis estimated the project's noise level at 59.6 dBA, which is within the applicable MDEP Noise Standard[2] of 60 dBA. (R. 6 at 5-8.) The plaintiffs also found this analysis inadequate.

The DEP issued a draft order and allowed public comments.[3] (R. 61.) They received substantial public comments, primarily voicing concern about the project. (R. 36-60, plus others.) The DEP issued the final order in October 2011. (R. 99.)

Thanks But No Tank, an association, and some of those individuals who voiced concerns about this project filed this appeal. They argue that

(1) DCP did not demonstrate compliance with the NRPA and the Site Law;

(2) the respondent did not consider the impact of accidents;

(3) the respondent did not consider the impact to air quality;

(4) the respondent's conclusion that the project will meet hourly sound standards is erroneous and unsupported by the evidence;

(5) the respondent did not consider noise from tanker trucks; and

(6) the respondent did not consider the effect of the project on natural resource-based businesses in the region.

---

[2] "The applicable MDEP noise standard for the project is 70 dBA during the day and 60 dBA at night at any protected location in a commercial zone. Since the facility will operate 24 hours per day, the nighttime noise limit of 60 dBA is the controlling standard." (R. 6 at 5-2.)
[3] No request for a public hearing was received. (R. 99.)

3

DISCUSSION

1. Standard of Review

This appeal is permitted pursuant to 38 M.R.S. § 346(1) (2011) and is controlled by the Maine Administrative Procedure Act, 5 M.R.S. § 11001 et seq., and Rule 80C. When reviewing administrative orders, the court may reverse the decision if the findings, inferences, conclusions or decisions are, among other things, "unsupported by substantial evidence on the whole record; or [a]rbitrary or capricious or characterized by abuse of discretion." 5 M.R.S. § 11007(4)(C)(5),(6) (2011). The court shall not "substitute its judgment for that of the agency on questions of fact." 5 M.R.S. § 11007(3) (2011).

Under the "substantial evidence" standard, the court examines the record to determine whether the agency could "fairly and reasonably find the facts as it did." Rangeley Crossroads Coal. v. Land Use Reg. Comm'n, 2008 ME 115, ¶ 10, 955 A.2d 223. Even if the record contains evidence inconsistent with the result, or a different conclusion could be drawn from the evidence, the court must uphold the agency's factual findings "if a reasonable mind might accept the relevant evidence as adequate to support the [agency's] conclusion." Town of Vienna v. Kokernak, 612 A.2d 870, 872 (Me. 1992).

Additionally, the court defers to the agency's interpretation of its own internal rules, regulations, and procedures "unless the rules or regulations plainly compel a contrary result." Rangeley Crossroads Coal., 2008 ME 115, ¶ 10, 955 A.2d 223.

2. Standing

DCP asserts that 19 of the 21 named individual petitioners as well as the association Thanks But No Tank do not have standing in this case. (Br. of DCP 10.)

4

Because there is no dispute that at least two of the named individual petitioners do have standing, this issue is not fatal to the appeal.

"A party has standing to appeal a judgment only where the judgment adversely and directly affects that party's property, pecuniary or personal rights." Gaynor v. McEachern, 437 A.2d 867, 871 (Me. 1981) (citing 14 M.R.S.A. § 1851). Each individual's injuries must be "distinct from the harm experienced by the public at large." Nergaard v. Town of Westport Island, 2009 ME 56, ¶ 18, 973 A.2d 735 (quoting Ricci v. Superintendent, Bureau of Banking, 485 A.2d 645, 647 (Me. 1984)). "If the appealing party is an abutter, the threshold requirements to establish standing are minimal." Sahl v. Town of York, 2000 ME 180, ¶¶ 8–9, 760 A.2d 266. The Law Court has also noted, "aesthetic interests are sufficiently real and definite to confer legal standing to sue." Uliano v. Bd. of Envtl. Prot., 2009 ME 89, ¶ 30, n. 7, 977 A.2d 400.

DCP agrees that two of the petitioners, Mr. Gocze and Mr. Hall, are abutting property owners and have standing in this case. (Br. of DCP 10.) The petitioners argue that all of the named individuals will be harmed if the facility is built. (Reply Br. of Pets.' 4-5.) Additionally, the petitioners rely on In Re International paper Co., 363 A.2d 235 (Me. 1976), where the court allowed standing for all parties under the Site Law based on the generalized harm of breathing contaminated air in an area affected by the location of the proposed development. Id. at 237-38 (allowing air and water quality as subject-matter issues "capable of aggrieving persons in relation to interests of specific concern under the Site Law.").

The petitioners rely on the allegations in the petition to show the petitioners have standing. Their standing must appear as a matter of record. Although some of the

5

petitioners' comments on the draft order appear in the record, it is difficult to determine standing based on those submissions. (R. 36, 37, 39, 41, 44.)[4]

DCP also argues that the association Thanks But No Tank does not have standing because it is an unincorporated association[5] and not a legal entity. Tisdale v. Rawson, 2003 ME 68, ¶ 15, 822 A.2d 1136 ("Generally, an unincorporated association does not have capacity to sue or be sued in its own name, absent specific statutory authorization."). Section 11001 provides that a "person aggrieved by final agency action" is entitled to judicial review. 5 M.R.S. § 11001(1) (2011). Section 482(4), relied on by the petitioners, includes an association in the definition of "person." 38 M.R.S. § 482(4) (2011). The record is insufficient to allow the court to determine whether the association has standing. (Br. of Pets. 1; Pet. ¶¶ 1, 10.)

3. Relevant Statutes

Natural Resources Protection Act

The department shall grant a permit upon proper application and upon such terms as it considers necessary to fulfill the purposes of this article. The department shall grant a permit when it finds that the applicant has demonstrated that the proposed activity meets the standards set forth in subsections 1 to 11, except that when an activity requires a permit only because it is located in, on or over a community public water system primary protection area the department shall issue a permit when it finds that the applicant has demonstrated that the proposed activity meets the standards set forth in subsection 2 and 5.

1. Existing Uses. The activity will not unreasonably interfere with existing scenic, aesthetic, recreational or navigational uses.

---

[4] The petitioners direct this Court to a series of e-mails and letters submitted by some of the parties to this 80C appeal, (see BR. of Pets.' at 11-12), but fail to cite to specific comments that identify any harm that is different from the impact to the general public or that appear as part of the formal record on appeal.

[5] The petitioners also state in their reply brief that Thanks But No Tank was granted Maine Non-Profit corporation status on April 13, 2012. (Reply Br. of Pets.' 4, n.3.) That allegation is not a matter of record.

38 M.R.S. § 480-D(1) (2011).    Chapter 315 of the Department of Environmental Protection Regulations "describes the process for evaluating impacts to existing scenic and aesthetic uses resulting from activities in, on, over, or adjacent to protected natural resources subject to the National Resources Protection Act, pursuant to 38 M.R.S.A. § 480-D(1)." 06-096 C.M.R. ch. 315 (summary) (2012).

Site Location of Development Act

> The department shall approve a development proposal whenever it finds the following.
> 3. **No adverse effect on the natural environment.** The developer has made adequate provision for fitting the development harmoniously into the existing natural environment and that the development will not adversely affect existing uses, scenic character, air quality, water quality or other natural resources in the municipality or in neighboring municipalities.
>    A. In making a determination under this subsection, the department may consider the effect of noise from a commercial or industrial development. Noise from a residential development approved under this article may not be regulated under this subsection, and noise generated between the hours of 7 a.m. and 7 p.m. or during daylight hours, whichever is longer, by construction of a development approved under this article may not be regulated under this subsection.
>    B. In determining whether a developer has made adequate provision for the control of noise generated by a commercial or industrial development, the department shall consider board rules relating to noise and the quantifiable noise standards of the municipality in which the development is located and of any municipality that may be affected by the noise.
>    C.    Nothing in this subsection may be construed to prohibit a municipality from adopting noise regulations stricter than those adopted by the board.

38 M.R.S. § 484(3) (2011).    Chapter 375 of the DEP regulations provide that the "regulations describe the scope of review of the Board in determining a developer's compliance with the 'no adverse effect on the natural environment' standard of the Site Location Law (38 M.R.S.A. Section 484(3)); the information which shall be submitted, when appropriate, within an application for approval; and, the terms and conditions

7

which the Board may impose on the approval of an application to ensure compliance with the standard." 06-096 C.M.R. ch. 375 (2012) (summary).

4. Visual Impact

The petitioners argue that the permits violate the laws regarding visual impact. They argue that the Penobscot Bay coastline is "a world-class scenic resource" and the construction of DCP's facility would "severely alter this incredible visual landscape." (Br. of Pets.' 17-18.) The petitioners maintain that the applications for the permits were inadequate. First, they argue that the DEP did not consider the impacts of mandated lighting, especially nighttime lighting. (Br. of Pets.' 19-21.) Second, they assert that the VIA is illegal because it is deficient. (Br. of Pets.' 22-30.)

a. Lighting

As a preliminary matter, it is not clear whether this issue was raised at the administrative level, as required. New England Whitewater Ctr., Inc. v. Dep't of Inland Fisheries & Wildlife, 550 A.2d 56, 58 (Me. 1988) (issues not raised at administrative level not preserved for appeal). The petitioners claim that the issue is preserved because lighting is mentioned in two e-mails sent by Ms. Ramsdell on September 7, 2011 and October 3, 2011 made during the comment period. (Br. of Pets.' 11-12; Reply Br. of Pets.' 10.) Wells v. Portland Yacht Club, 2001 ME 20, ¶ 5, 771 A.2d 371 (explaining that the agency, not the court, should have the first opportunity to decide an issue).

In her September 7 e-mail, Ms. Ramsdell discusses general grievances made by the public at a hearing she attended in January. (See R. 38.) While Ms. Ramsdell made reference "to the usual fears of dangerous accidents, concerns about additional lighting and tremendous increase of heavy truck traffic..." the focus of her concern was the aesthetic impact the tank would have on Searsport and the "adverse affect on local and area businesses..." It is doubtful that an e-mail about generalized public grievances is

8

sufficient to provide notice. See Wells, 2001 ME 20, ¶ 6, 771 A.2d 371 (stating that letters and comments are not sufficient enough to alert the Board of an issue).

In contrast, in her October 3 e-mail, Ms. Ramsdell raises specific issues with DCP's application that she believes to be "either disregarded or 'conveniently' covered by DCP." (R. 90.) In particular, Ms. Ramsdell asks the questions "What about lighting? Is the tank just going to hide in the dark at night?" (Id.) Petitioners argue, in their Reply Brief, that this e-mail is "no generalized grievance" and "alerted DEP and DCP that the Department must consider lighting impacts and that the application lacked the required lighting plan." (Reply Br. of Pets.' 11.)

Although the facility requires nighttime lighting, (see 33 C.F.R. § 127.1109 (2012) (requiring outdoor lighting for liquefied hazardous gas)), the DEP did not consider the visual impact of safety and security lighting because it was not required to do so. The regulations for the Site Law do not require consideration of nighttime lighting, unless the facility is a large parking lot. See 06-096 C.M.R. ch. 375, § 14(B)(3) (2012) (providing guidelines for the landscaping of parking lots).

The petitioners argue that "common sense" informs the court that the DEP must consider lighting in order to comply with the rules and regulations. (Reply Br. of Pets.' 7.) The regulations, for both NRPA and Site Law, require full consideration of the visual impact. 06-096 C.M.R. ch. 315, § 6 (2012) ("An applicant is required to demonstrate that the proposed activity will not unreasonably interfere with existing scenic and aesthetic uses of a scenic resource listed in Section 10."); 06-096 C.M.R. ch. 375, § 14(B)(3) (2012) (requiring Board to consider relevant evidence showing that "structures will be designed and landscaped to minimize their visual impact on the surrounding area"). Because the regulations do not require the DEP to consider the

9

impact of nighttime lighting, the DEP determines whether it must consider lighting with regard to the overall visual impact.

b. Visual Impact Assessment Deficiencies[6]

The petitioners submit a variety of reasons to support their argument that DCP's VIA is deficient for purposes of approval of the NRPA permit:

(1) "DCP arbitrarily limited the radius of the viewshed analysis to a one-mile APE [Area of Potential Effects] and a less detailed three-mile review area, as measured from the bulk storage tank rather than from the project boundaries." (Br. of Pets.' 22.)

(2) DCP did not include the visual impact of increases in ship and truck traffic resulting from the project. (Id.)

(3) "All visual impacts beyond three miles from tank were arbitrarily excluded without explanation or justification." (Br. of Pets.' 23.)

(4) "DCP failed to accurately inventory scenic resources in the MDEP Visual Evaluation Field Survey Checklist."[7] (Br. of Pets.' 24.)

(5) The description of existing land use and scenic quality is incomplete and biased because it does not "describe or illustrate the existing natural scenic character and scenic and aesthetic uses of the surrounding landscape." (Id.)

(6) The VIA is inaccurate because it maps only a three-mile radius and the photo-simulation does not show the clear cutting and resulting changes.[8] (Br. of Pets.' 25-27.)

(7) DCP did not provide a worst-case photo-simulation or line-of-sight profiles from most of the identified protected scenic resources. (Br. of Pets.' 27.)

(8) DEP used incomplete and inaccurate data to determine that the Total Visual Impact Severity was moderate and the visual impacts were acceptable. (Br. of Pets.' 28-29.)

(9) "DCP and DEP failed to address the impact on viewer expectations or the cumulative visual impacts of industrial development on the Searsport and Penobscot Bay region." (Br. of Pets.' 29.)

---

[6] The VIA is an optional assessment. "The Department may require a visual impact assessment if a proposed activity appears to be located within the viewshed of, and has the potential to have an unreasonable adverse impact on, a scenic resource." 06-096 C.M.R. ch. 315, § 7 (2012).

[7] Based on the application, all of the necessary scenic resources were taken into consideration even if they were not all listed on the checklist. (R. 8 at 14-1 to 14-3.)

[8] The DCP points out that not all of the vegetation will be clear-cut. (DCP Br. 14.) "DCP has committed to leave undisturbed the approximately 6-acre, wooded upland on the land they will own between the existing railroad tracks and Long Cove." (R. 6 at 10-1.)

These alleged deficiencies either are not deficiencies or they are insufficient to require a remand. Further, many of these complaints are interrelated. For example, complaint number eight, above, is a generalization of the other alleged deficiencies.

The VIA considered a one mile radius from the tank, not the border of the facility, and a three mile radius. The petitioners claim that several aspects of these sizes were deficient because they were arbitrary and did not take the full viewshed[9] into account. The guidelines do not require that the radius go to the outer edge of the viewshed, or that the radius is measured from a specific point. Instead, the regulations say, "[t]he radius of the impact area to be analyzed must be based on the relative size and scope of the proposed activity given the specific location." 06-096 C.M.R. ch. 315, § 7 (2012). The record does not show that a larger radius is necessary based on the specific location and proposed activity.

DCP asserts in its application that the view of the tank is minimized through its location:

> The screening of potential visual impacts from the terminal facilities located on the upper parcel will be achieved through using a combination of existing and proposed topography and forest vegetation. The existing topography of the upper parcels drops significantly between U.S. Route 1 and the shoreline. This downward slope between U.S. Route 1 and the shoreline will limit views of the project from the south along U.S. Route 1. In addition, the base of the largest structure at the facility, the bulk storage tank, has been established at as low an elevation as feasible. Views of the project are further limited by retaining as much of the existing tree cover as can be allowed by facility safety and security requirements. Visual screening will also be enhanced in most directions by existing tree cover on surrounding properties.

(R. 8 at 14-3.)

---

[9] Definition of "viewshed"
> The geographic area as viewed from a scenic resource, which includes the proposed activity. The viewshed may include the total visible activity area from a single observer position or the total visible activity area from multiple observers' positions.

06-096 C.M.R. ch. 315, § 5(I) (2012).

11

The record reveals comments from concerned residents and business owners about the size of the viewshed, including photos taken from a helicopter hovering "over the proposed site of the DCP tank at the projected tank height." (R. 88.) These photos show panoramic views with the helicopter, but the distances and the accuracy of the helicopter's location are unknown. (R. 88.) Although the DEP must consider all input, the residents' primarily anecdotal evidence does not mandate vacating the DEP's decision. Based on the record, the radius used is sufficient.

The petitioners' concerns involving the existing uses and viewers' expectations present a similar problem. DCP discussed these concerns in the application and the information was before the respondent. (R. 14-1-14-4.) The respondent's conclusion that the impact was not substantial enough to deny the permits does not suggest that the respondent did not consider the information. The record supports the DEP's decision regarding the VIA.

Perhaps the petitioners' strongest argument relates to concern number seven, above. The petitioners assert that DCP did not provide a worst-case photosimulation or line-of-sight profiles from most of the identified protected scenic resources. (Br. of Pets.' 27.) Based on the regulations it is unclear whether the DCP was required to submit additional line-of-sight profiles. The regulations provide:

> Areas of the scenic resource from which the activity will be visible, including representative and worst-case viewpoints, must be identified. Line-of-sight profiles constitute the simplest acceptable method of illustrating the potential visual impact of the proposed activity from viewpoints within the context of its viewshed.

06-096 C.M.R. ch. 315, § 7 (2012). In the application DCP identified impacted scenic resources, but it did not necessarily indicate which viewpoints were representative or worst-case. (R. 8, 14-1-14.4.) DCP included one line-of-sight profile photosimulation. (R. 8, 14.) Subsequently, additional viewpoints were submitted, "that were in the

12

historic structures report sent to the MHPO, taken from the closest NRHP-eligible structures on Route 1." (R. 93.)[10] In this later correspondence, DCP indicated that the photosimulation included with the application was from Sears Island and "represented the 'worst case' from tidal waters where most recreational boaters would be." (R. 93.)

The three photosimulations appear to be the only line-of-sight profiles provided by DCP. The respondent was clearly aware of this issue because it requested additional photos after the draft order was distributed for review and concerned parties had complained. (R. 61, 93.)[11] The regulations do not require a certain number of line-of-sight profiles. The respondent determined the available photosimulations were representative and included a worse-case viewpoint.

The respondent had sufficient evidence to conclude the VIA was adequate. The petitioners took advantage of the opportunity to submit additional evidence, which the respondent considered in conjunction with the VIA.

5. Accidents and Precautions

The petitioners argue that the respondent did not have all of the necessary information to make its decision because it did not consider federal studies regarding

---

[10] The images in the record are black and white photocopies. The tank is not visible on one. (R. 93, Figure 20.)

[11] The DCP responded to this request by providing the additional photosimulations and stating the following argument:

> We did not do any others from the water or shoreline because we felt the one from Sears Island represented the "worst case" from tidal waters where most recreational boaters would be. We could do additional simulations from the shore, such as Moose Point State Park which apparently has been raised as a location where one should have been done, but if the tank is visible (our view shed model indicates there is a chance you could see it from one spot right on the shoreline) it would be much farther away than from Sears Island, it would only be the very top of the tank, and it would be in the background of the existing Sprague/Irving terminals. Doing simulations from the water can be done but it is more problematic for the obvious reason. So our preference is to see how the appeal plays out and, if it is decided that an additional simulation or two are necessary, DCP will do them. If you feel strongly about doing additional simulations now, don't hesitate to let me know.

(R. 93.) The DEP did not require an additional photo-simulation.

13

existing uses and public safety. (Br. of Pets.' 31-37.) The respondent replies that it is not charged with analyzing risks of accidents and terrorist attacks. (Br. of Resp. 13.) The respondent argues further that it can issue permits prior to the issuance of federal permits. (Br. of Resp. 14.) DCP argues similarly that the respondent need not consider these issues. (Br. of DCP 27-31.)

Based on a review of the statutes and accompanying regulations, the respondent is not required to analyze the risk of accidents and attacks. Such analysis is done by other permitting organizations. The order specifically requires that the applicant "secure and comply with all applicable Federal, State, and local licenses, permits, authorizations, conditions, agreements, and orders, prior to or during construction and operation as appropriate." (R. 99, 18; see also 99, 17; 99, 19.)

6. Air Quality

The petitioners argue that the respondent violated the Site Law by not properly considering the increased non-point source air pollution caused by increased traffic. (Br. of Pets.' 38-39.) The Site Law regulations provide:

> The Board recognizes that point sources emissions from certain types of commercial and industrial developments and solid waste disposal facilities and non-point source emissions deriving from industrial, commercial, and governmental development can have an unreasonable adverse effect on air quality.

06-096 C.M.R. ch. 375, § 1(A) (2012); see also id. § 1(C).

The parties dispute the significance of the increase in the number of trucks for the community. The respondent and DCP argue the increase in traffic in minimal. (Br. of Resp. 15; Br of DCP 22.) The petitioners argue that the number of trucks is increased substantially. (Br. of Pets.' 39.) The focus must be the effect of emissions on air quality. In its application, DCP stated: "Non-point sources of air emissions such as fugitive dust will be insignificant and associated primarily with construction of the facility. The

14

construction plan provides for controlling the amount of dust generated by application of water and/or calcium chloride on dry dusty surfaces. Following construction, facility roads and production areas that will receive frequent truck and other traffic will be paved." (R. 6, 21-1.) The respondent's conclusion on this issue is supported by the record. (R. 99, 15 of 20.)

7. Noise

The petitioners argue that DCP did not fully and properly identify all of the sources and impacts of noise associated with the facility. (Br. of Pets.' 40-48.) In part, they argue that not all of the necessary equipment was used in the model. Most of the equipment that they list, however, is not equipment used in routine operation. For example, the flares and generators are not part of routine operation.

Under the regulations, "the hourly sound levels resulting from routine operation of the development . . . shall not exceed . . . 70 dBA between 7:00 a.m. and 7:00 p.m." and "60 dBA between 7:00 p.m. and 7:00 a.m." 06-096 C.M.R. ch. 375, § 10(C)(1)(iii) (2012).[12] In the application, DCP provided a calculated project noise level of 59.6 dBA. (R. 6 at 5-8.)

The regulations provide little guidance regarding information that must be submitted with the application concerning noise. "Technical information shall be submitted describing the applicant's plan and intent to make adequate provision for the control of sound." 06-096 C.M.R. ch. 375, § 10(D)(2) (2012). The regulations provide a list of information to be provided "when appropriate." Id. Because predicting noise may be a difficult task,[13] the regulations request general information such as "a description of major sound sources, including tonal sound sources and sources of short

---

[12] The parties appear to agree that these guidelines apply. Because the facility is expected to be in operation 24 hours a day, the nighttime limit is used as the overall limit.

[13] The word "expected" is used often. 06-096 C.M.R. ch. 375, § 10(D)(2)(e), (f),(g) (2012).

15

duration repetitive sounds, associated with the construction, operation and maintenance of the proposed development, including their locations within the proposed development." Id. § 10(D)(2)(b).

Although estimations were included in the application regarding noise, the language of the regulations assumes estimates will be provided. There is no indication that these estimations are incorrect. The respondent accepted the information provided in the application.

The petitioners also argue that the application does not take into account the trucks that will idle for less than 60 minutes during their trip to the facility. (Br. of Pets.' 47.) Although the petitioners express valid concerns regarding these trucks and the increased noise, DCP was not required to include them as part of the assessment. "Sounds associated with the following shall be exempt from regulation by the Board . . . [r]egistered and inspected vehicles[] while operating on public ways, or which enter the development to make a delivery or pick up and which are moving, starting or stopping, but not when they are parked for over 60 minutes in the development." 06-096 C.M.R. ch. 375, § 10(C)(5)(c) (2012). Since the application complied with the regulations the DEP's decision to issue the permit is not arbitrary and it is supported by substantial evidence.

8. Impact on resource-based businesses

The petitioners request that the respondent consider the economic impact of the project. (Br. of Pets.' 49-50.) The respondent is required to regulate the cumulative impact of the project on the environment, not on the commercial aspects of the community. The regulations of the relevant permitting laws indicate that existing scenic and aesthetic uses must be taken into consideration.

16

It is the responsibility of the applicant to demonstrate that the proposed design does not unreasonably interfere with existing scenic and aesthetic uses, and thereby diminish the public enjoyment and appreciation of the qualities of a scenic resource, and that any potential impacts have been minimized.
The Department's determination of impact is based on the following visual elements of the landscape:
 A. Landscape compatibility . . .
 B. Scale contrast . . .
 C. Spatial dominance . . . .

06-096 C.M.R. ch. 315, § 9 (2012).

The non-industry uses are based on the visual beauty of the area. (See, e.g., R. 8 at 14-1.) It is clear that the tank will be seen from the surrounding area. But the project is located in an industrial area adjacent to existing petroleum storage and distribution facilities. The record does not reflect that the impact of the project on existing scenic and aesthetic uses required the respondent to deny the permit.

The entry is

> The Decision of the Department of Environmental Protection is AFFIRMED.
>
> Petitioners Gocze and Hall have STANDING to appeal. The remaining Petitioners are DISMISSED from this Appeal.

Date: November 13, 2012

Nancy Mills
Justice, Superior Court

17

| Date Filed | 12/2/11 | Kennebec County | Docket No. AP-11-58 |
|---|---|---|---|

Action: <u>Petition For Review</u>
80C

# J. Mills

| <u>Thanks But No Tank, et al.</u> | vs. | <u>ME Dept of Environmental Protection</u> |
|---|---|---|

Plaintiff's Attorney

Stephen Hinchman, Esq.
537 Fosters Point Road
West Bath, ME 04530

Defendant's Attorney

James Kilbreth, Esq. (PII DCP)
84 Marginal Way Suite 600
Portland Maine 04101

Kelly Boden, Esq
One Portland Square
Portland Maine 04112-0586

<u>Date of Entry</u>

| | |
|---|---|
| 12/7/11 | Petition For Review Of Final Agency Action, filed 12/2/11. s/Hinchman, Esq. |
| 1/3/12 | Certification of Record, filed. s/Bensinger, AAG |
| 1/6/12 | DCP Midstream Partners, LP Notice of Appearance, filed. s/Kilbreth, Esq. |
| 1/12/12 | Phone Conference set for 1/24/12 at 8:00 a.m. with Justice Mills. Notice mailed to attys. of record |
| 1/24/12 | Telephone conference with Attorneys Kilbreth, Boden, Hinchman and AAG Bensinger. No objection to my handling case. Copies to attys. of record. |
| 1/26/12 | Notice and Briefing Schedule issued. Copies mailed to attys. of record. |
| 3/5/12 | Petitioners' Brief, filed. s/Hinchman, Esq. |
| 3/14/12 | Amended Index to Record, filed. s/Bensinger, AAG |
| 4/2/12 | Motion for Enlargement of Time, filed. s/Bensinger AAG Proposed Order, filed. |
| 4/3/12 | ORDER, Mills, J. The motion is unopposed and it is granted. Responsive briefs must be filed on or before April 6, 2012. Copies to attys. of record. |
| 4/6/12 | Brief of Respondent, filed. s/Bensinger, AAG |
| | 80C Opposition Brief of Intervenor DCP Midstream Partners, LP, filed. s/Boden, Esq. |
| 4/23/12 | Petitioner's Reply Brief, filed. s/Hinchman, Esq. |

11/13/12    DECISION AND ORDER, Mills, J.
The Decision of the Department of Environmental Protection is AFFIRMED.
Petitioners Gocze and Hall have STANDING to appeal. The remaining
Petitioners are DISMISSED from the Appeal.
Copies to attys. of record.
Notice of removal of exhibits mailed to attys. of record.